## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 25-cr-00190 (ABJ)** |
| **v.** | |
| **DAMON MIDDLETON and MICHAEL ALSTON,** | |
| **Defendants.** | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF
## PRETRIAL DETENTION FOR DEFENDANT MICHAEL ALSTON

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its motion that the Defendant Michael Alston be detained pending trial pursuant to 18 U.S.C. §§ 3142(d)(1)(A)(iii) (On Probation/Parole) and 3142(f)(1)(E) (Firearm/Other Dangerous Weapon) of the Bail Reform Act. On May 9, 2025 through May 10, 2025, Defendant Alston and co-Defendant Damon Middleton (collectively, the "Defendants") kidnapped and carjacked at gunpoint the victim, a 73-year-old man bearing the initials C.S., before driving him to multiple ATMs in Maryland and attempting to withdraw funds from C.S.'s bank accounts. The Defendants ultimately abandoned C.S. with his hands zip tied behind his back in Hyattsville, MD before returning to Washington, DC and burning his vehicle such that it was undrivable and no DNA evidence could be obtained from it. Considering the factors specified under 18 U.S.C. § 3142(g), there is no condition or combination of conditions that will reasonably assure Defendant Alston's appearance in court and the safety of any other person and the community.

## BACKGROUND

On May 9, 2025, at approximately 9:00 PM, the victim, 73-year old C.S., was returning to

his home in Northeast Washington, D.C. The victim had just come home from a nearby grocery store. He was unsure of the precise time, but C.S. estimated the time was about 9:00 PM. The victim entered the parking garage at his home and parked his vehicle, a 2008 Red Dodge Caravan, near a bicycle storage room.



**At approximately 9:01 PM, the victim's vehicle enters the garage.**



**At approximately 9:02 PM, the victim's vehicle pulls into a spot behind the gated bike room**

As the victim was exiting his vehicle, Defendants Damon Middleton and Michael Alston appeared from an unknown direction and pushed him to the ground. The victim was hit a few times

with the butt of a gun, and a towel was placed over his head. The victim's wrists were bound with

zip ties. The victim informed law enforcement that one of the subjects asked him, "Where's the

money at?" The victim advised the Defendants that he did not have any money.



**At 9:04 PM, SUBJECT-1, later identified as Defendant Middleton, in a black top, black pants, white socks exposed, and black boots walks alongside the bike room toward the victim's vehicle.**



**At 9:05 PM SUBJECT-2, later identified as Defendant Alston, in a black hooded sweatshirt, black pants, and black and white Nike DT 96 sneakers follows SUBJECT-1 as he is approaching the victim's vehicle.**

The victim further advised law enforcement that one of the Defendants asked, "You have money in the house?", and removed the victim's keys from the vehicle, which were still in the ignition. The victim's wallet and phone were also taken.

According to the victim, one of the Defendants left the garage and went up to the victim's apartment, while the other stayed downstairs with him. Law enforcement later identified that individual as Defendant Middleton. After Defendant Middleton's return to the garage, both Defendants Middleton and Alston placed the victim inside his own vehicle, and all three left the parking garage.



**At 10:15 PM, the victim vehicle's exits the garage.**

The victim recalled being driven around to various ATMs, where Defendants Middleton and Alston demanded that the victim provide his debit card PIN to withdraw cash. The victim advised that he could not remember his pin number, so either Defendant Middleton or Defendant Alston grabbed a bat, which was already located in the back of the victim's vehicle, and struck the victim multiple times on or about his head and body.

During his interview with law enforcement, the victim indicated that he did not know whether money had been withdrawn from his bank account, and he was not able to provide the location of the stops, as his face was covered most of the time. However, he informed officers that they stopped at approximately five or six ATMs.

The victim further informed law enforcement that after the last ATM stop, the Defendants abandoned the victim in a wooded area at/near 6919 Greenvale Parkway in Hyattsville, MD. The victim reported that, at the time, the Defendants threw the victim onto the ground and performed a "mock execution" by pointing a firearm at him, at which point the victim believed that the Defendants were going to kill him. Instead, however, the Defendants fled in the victim's vehicle, leaving the victim alone in an empty parking lot. The victim's hands were tied with zip ties, which is how the responding Prince George's County Police Officer ultimately found him several hours later.

On May 10, 2025, at approximately 2:15 AM (*i.e.*, a few hours after the Defendants had kidnapped the victim), the DC Office of Unified Communications ("OUC") received a call for a vehicle on fire in the 100 Block of Wilmington Place SE. Law enforcement responded to the scene, processed the vehicle, and determined that it was the victim's vehicle.



**Photo of the victim's burnt vehicle.**

Law enforcement ultimately canvassed the victim's apartment and observed that the apartment door was unlocked. Consistent with the victim's report, the apartment appeared to have been ransacked. The apartment was in disarray and law enforcement observed that it appeared that someone had gone through the drawers.

During an interview with law enforcement, the victim confirmed that the Defendants had taken the victim's phone during the kidnapping. On June 11, 2025, law enforcement received historical cell site location records for the victim's cellphone. These historical cell site location records confirmed the time and locations to which the Defendants had driven after kidnapping the victim and carjacking the victim's vehicle.

According to victim's CashApp records, there were multiple attempted and completed ATM withdrawals utilizing the victim's CashApp card during the timeframe of the kidnapping. For example, on May 9, 2025, at approximately 11:12 PM, Defendant Middleton drove the victim

in the victim's vehicle to the Bank of America located at 6038 Greenbelt Road, Greenbelt, MD. The victim's CashApp records indicate that there were two $24 attempted CashApp withdrawals. Bank of America provided CCTV footage of the attempted withdrawals. The driver, who was later identified as Defendant Middleton, places a white substance on the camera of the ATM to obfuscate the camera view while attempting the withdrawals. The video clearly shows the clothing of the driver.



**SUBJECT-1, later identified as Defendant Middleton attempting to withdraw money at Bank of America. SUBJECT-1 is seen wearing a black long sleeve jacket with distinct white stripes on the sleeves.**

Approximately thirty minutes later, at 11:40 PM, Defendant Middleton drove the victim in the victim's vehicle to M&T Bank located at 7599 Greenbelt Road, Greenbelt, MD. The victim's CashApp records indicate that there were two successful $506 CashApp withdrawals at this location. M&T Bank provided CCTV footage of the withdrawals. Defendant Middleton places a

white item over the camera of the ATM to obfuscate the camera view while making the withdrawals; however, the video clearly shows the clothing of the driver.



**SUBJECT-1, later identified as Defendant Middleton, attempting to withdraw money at M&T Bank. SUBJECT-1 is seen wearing a black long sleeve jacket with distinct white stripes on the sleeves.**

After the incident, the victim also contacted his bank, which revealed that the Defendants had attempted to withdraw $203 from the Wells Fargo ATM located at 6235 Baltimore Avenue, Riverdale, MD. Investigators followed up with Wells Fargo, which revealed that on May 10, 2025, at approximately 12:40 AM, a red Dodge van, matching the of the victim's vehicle, pulled up to the ATM and attempted to withdraw money. Only the driver could be observed in the CCTV footage.



**SUBJECT-1, later identified as Defendant Middleton, withdrawing money at the Wells Fargo ATM seen wearing a black long sleeve jacket with distinct white stripes on the sleeves, gloves, a face mask, and sunglasses.**



**The victim's vehicle at the drive-through of the Wells Fargo ATM.**

Law enforcement ultimately reviewed CCTV footage of all entry points at the victim's apartment building. Law enforcement did not observe any individuals matching the Defendants enter the apartment building on foot prior to the kidnapping. Law enforcement then reviewed the parking garage entry gates for any vehicles entering the parking garage without utilizing a key fob.

On two instances before the kidnapping, an older-model green Honda sedan with fading paint, damage to the top of the vehicle, silver rims, a sunroof, and Virginia tags followed another

vehicle into the garage without utilizing a key fob. On one instance, the vehicle entered the garage on May 9, 2025, at approximately 7:20 PM by following a silver Chevrolet SUV. The Honda exited the garage at approximately 7:28 PM. The same Honda then reentered the garage without utilizing a key job at approximately 8:21 PM (*i.e.*, less than an hour before the kidnapping), this time following in a red Dodge Durango.



**The subject vehicle entering the parking garage at approximately 7:20 PM.**



**The subject vehicle reentering the garage at approximately 8:22 PM.**

Law enforcement reviewed the entrance and exit gates in the parking garage from 8:22 PM until the Honda was observed leaving the garage.  The Honda was not observed leaving the garage until May 10, 2025, at approximately 2:57 AM (*i.e.*, approximately 40 minutes after the 911 call on Wilmington Place SE reporting that the victim's vehicle was on fire).



**The subject vehicle exiting the garage at approximately 2:57 AM.**

Review of interior surveillance footage of the victim's apartment building showed that one of Defendants, later identified as Defendant Alston, reentered the victim's apartment building at 2:48 AM, shortly before the green Honda left the parking garage at 2:57 AM.



**SUBJECT-2, later identified as Defendant Alston, entering the victim's apartment building at 2:48 AM.**

That individual, later identified as Defendant Alston, was identified by his distinct black and white Nike DT 96 sneakers. He was observed in the lobby and leasing office hallway prior to walking around the building for several minutes before moving in the direction of the stairwell that leads to the parking garage.



**SUBJECT-2, later identified as Defendant Alston utilizing the lobby elevator.**



**SUBJECT-2, later identified as Defendant Alston, attempting to utilize the freight elevator before walking in the direction of the stairwell leading to the parking garage.**

Investigators then utilized the Flock License Plate Reader ("LPR") camera system to search for similar Hondas with Virginia tags. Investigators located a nearly identical Honda sedan with a damaged roof, fading paint, silver rims, and Virginia tags. The vehicle is a 2000 Honda bearing Virginia Tag TCM2872. It should also be noted that the vehicle passed an LPR reader near Florida Avenue and Rhode Island Avenue NE, Washington, DC on May 9, 2025, at 8:02 PM, between the time the subject vehicle first entered the victim's parking garage and the second time the subject vehicle reentered the victim's parking garage. See the below images for comparison. Below are images of this vehicle, alongside the subject vehicle from the victim's parking garage.



**Flock LPR results from May 10, 2025**

Investigators obtained registration information for the 2000 green Honda Accord with Virginia Tag TCM2872. This vehicle is registered to Defendant Middleton. Investigators noticed significant paint damage on the hood, trunk, and roof. Defendant Middleton's vehicle also has a white/light sticker on the bottom-left corner of the rear window.

Investigators received a log of key fob activity from the victim's apartment building on the night of the kidnapping. This log confirmed that the victim's key fob was used during the following times, coinciding with the images above.

    a.    May 9, 2025, at 9:01 PM: video footage revealed the victim's vehicle entering the garage

    b.    May 9, 2025, at 9:22 PM: video footage revealed Defendant Middleton entering the elevator in the victim's building

    c.    May 9, 2025, at 10:00 PM: video footage revealed Defendant Middleton in the elevator bank of the victim's building a second time

    d.    May 10, 2025, at 2:48 AM, 2:50 AM, and 2:52 AM (three separate fob reads): video footage revealed Defendant Alston entering the victim's building

Investigators conducted queries through several different LPR systems of Defendant Middleton's vehicle. Over the past thirty days, Defendant Middleton's vehicle was located by several LPR systems. The majority of the reads were passing by fixed LPR readers. Investigators

noted two reads from a mobile LPR affixed to a police vehicle on May 13, 2025 and May 19, 2025, both of which were on Wisconsin Avenue NW in front of the City Ridge apartment complex in the 3900 Block of Wisconsin Avenue NW.

On May 22, 2025, investigators responded to the City Ridge apartment complex located at 3939 Wisconsin Avenue NW, Washington, DC. Investigators confirmed that Defendant Middleton's mother has leased an apartment unit in that building since April 2025. Defendant Middleton's vehicle was also registered to that same apartment unit.

Investigators reviewed video footage from the City Ridge apartment complex on May 9, 2025 and May 10, 2025 (*i.e.*, the days before and after the kidnapping). On May 9, 2025, at approximately 2:24 PM, Defendant Middleton is observed exiting the elevator into the parking garage wearing a black long-sleeve jacket with distinct white stripes on the sleeves, black pants, black shoes, and white socks—matching the clothing worn by SUBJECT-1 in the images shown above. Defendant Middleton's vehicle was seen exiting the parking garage shortly thereafter.

Defendant Middleton's vehicle then reentered the City Ridge parking garage on May 10, 2025, at approximately 1:33 PM. Defendant Middleton was wearing the same clothing as the day before: the black long-sleeve jacket with distinct white stripes on the sleeves, black pants, black shoes, and white socks. He can be seen entering the elevator bank from the parking garage, this time with sunglasses on top of his head, matching the description of the driver (also referenced as SUBJECT-1) from the Wells Fargo CCTV footage discussed above.

### Cell Site Records

According to call-detail records, Defendant Middleton was in contact with Defendant Alston repeatedly since May 3, 2025. Additionally, law enforcement obtained the historical cell site location data for Defendant Middleton's cellphone, which showed that his device was at/in the

vicinity of multiple locations associated with the kidnapping on the evening of May 9, 2025 and into the early-morning hours of May 10, 2025. Defendant Middleton's historical cell site location data was also consistent with the CCTV footage captured at the victim's apartment building, which showed the subject vehicle entering the parking garage twice prior to the kidnapping. In comparison, the historical cell site location data showed Defendant Middleton's cellphone was in the vicinity of the victim's apartment building prior to the kidnapping, left the area, and then returned for the time period that the Defendants were seen on CCTV footage in the parking garage.

Law enforcement also obtained the historical cell site location data for Defendant Alston's cellphone, which showed that it was also at/in the vicinity of multiple locations associated with the kidnapping on the evening of May 9, 2025 and into the early-morning hours of May 10, 2025. Like Defendant Middleton's data, Defendant Alston's historical cell site location data was consistent with the CCTV footage captured at the victim's apartment building, which showed the subject vehicle entering the parking garage twice prior to the kidnapping. Defendant Alston's data also showed Defendant Alston's cellphone was in the vicinity of the victim's apartment building prior to the kidnapping, left the area, and then returned during the time period that the Defendant were seen on CCTV footage in the parking garage. The data also shows Defendant Middleton's and Defendant Alston's devices returning to the victim's apartment building on the morning of May 10, 2025, when CCTV footage captured an individual later identified as Defendant Alston inside the apartment building.

Call-detail records also establish that the Defendants communicated by phone while CCTV captured an individual later identified as Defendant Alston inside the victim's apartment building on the morning of May 10, 2025. Law enforcement believes that Defendant Alston returned to the victim's apartment building to retrieve Defendant Middleton's vehicle from the parking garage,

which had been parked since approximately 8:22 PM.

Law enforcement also reviewed the victim's historical cell site location information.  Most importantly, during the kidnapping, the victim's cellphone, Defendant Middleton's cellphone, and Defendant Alston's cellphone were traveling together until May 10, 2025, at approximately 2:27 AM, when Defendant Middleton and Defendant Alston's cellphones (but not the victim's cellphone) were in the vicinity of the victim's vehicle that was burned on the 100 Block of Wilmington Place SE.

### CashApp Records

During a subsequent interview with the victim, the victim informed law enforcement that $2,600 was sent from his CashApp account to a different account without his permission on May 10, 2025, at 12:04 AM.  Indeed, records from the victim's CashApp account revealed a $2,600 peer-to-peer payment on May 10, 2025, at approximately 12:04 AM, to an account later identified as belonging to T.F.  Based on records associated with T.F.'s CashApp account, law enforcement was able to identify T.F.'s phone number and iCloud account.   Based on these records, law enforcement learned that T.F. and Defendant Alston were in communication during the kidnapping.  Specifically, on May 9, 2025, at approximately 11:08 PM, during the kidnapping and about an hour before T.F. had received any money from the victim's CashApp account, Defendant Alston sent to T.F. a message stating, "Ite I just bagged a n****, could I send u 3800$ and get u to send it somewhere else but keep 250$ for urself."  Defendant Alston also messaged to T.F., "Yea I was gon send u 3800 and I wanted u send 3550 somewhere and keep the rest."  T.F. replied, "Ok," before stating, "It's my number if you need it."  On May 10, 2025, at approximately 10:18 PM (*i.e.*, about a day after the kidnapping), Defendant Alston also provided an additional CashApp account and stated, "Send [$]1150."  On May 10, 2025, at approximately 10:20 PM (*i.e.*, approximately two minutes after Defendant Alston directed T.F. to "send 1150"), T.F. sent a

$1,150 peer-to-peer CashApp payment to the specific CashApp account, as directed.  According

to CashApp records, that CashApp account was not registered to either of the Defendants.

According to CashApp records associated with that account, on May 11, 2025, at approximately

12:01 AM (*i.e.*, approximately an hour and a half after T.F. had sent the funds), $1,006 was

withdrawn from that CashApp account at a Chase Bank ATM located at 1555 Maryland Avenue

NE, Washington, DC.   Law enforcement received screenshots of the Chase Bank ATM

withdrawal, and based on known photographs, it appears that Defendant Middleton was utilizing

that CashApp card to withdraw the funds.  Below are screenshots from that withdrawal.



**Defendant Middleton entering the Chase Bank located at 1555 Maryland Avenue NE. The green Honda can be seen parked with the headlights on in the background.**



**Defendant Middleton in the Chase Bank ATM during withdrawal.**

Law enforcement also observed on T.F.'s iCloud account a photo of Defendant Alston wearing the same black and white Nike DT 96 sneakers worn by SUBJECT-2 (later identified as Defendant Alston) during the kidnapping, as shown below.



**Photo of Defendant Alston wearing the Nike DT 96 sneakers from T.F.'s iCloud account, appearing to hold an iPhone (left).  Photo of Defendant Alston from records associated with Defendant Alston's CashApp account (middle).  Image of SUBJECT-2 wearing the Nike**

**DT 96 sneakers from night of the kidnapping (right).**

During an interview with the victim, the victim confirmed that the transactions that had occurred on the evening of May 9, 2025 and the morning of May 10, 2025 were made by the same individuals who had kidnapped and carjacked him. The victim also confirmed that they had taken the victim's cellphone during the kidnapping.

On May 10, 2025, at approximately 11:19 AM, T.F. also sent a $1,020 peer-to-peer CashApp payment. According to records associated with that CashApp account, the account is not registered to either Defendant Middleton or Defendant Alston. According to those records, between approximately 1:30 PM and 1:36 PM, that account's CashApp card was used to make multiple withdrawals, totaling $1,005, from a PAI ATM located at Earls Super Liquor Store at 833 Southern Avenue SE, Oxon Hill, MD. Based on a review of iCloud messages with Defendant Alston, law enforcement believes that Defendant Alston had access to that CashApp account and received at least some of the money associated with these withdrawals.

### The Defendants' Indictment and Arrest

On July 8, 2025, a Grand Jury for the United States District Court for the District of Columbia returned an indictment charging Defendant Middleton and Defendant Alston with 18 U.S.C § 1201 (Kidnapping); 22 D.C. Code §§ 2803, 4502 (Armed Carjacking); 22 D.C. Code § 4504(b) (Possession of a Firearm During a Crime of Violence); and 18 U.S.C. § 2312 (Transportation of Stolen Vehicle). Warrants were issued for their arrests.

On July 11, 2025, the FBI executed residential search warrants at two addresses that are, respectively, associated with Defendant Middleton and Defendant Alston. Defendant Middleton was not inside the particular apartment unit at the time of the FBI's entry, but he was located and arrested in the apartment building shortly thereafter. Among other items, the FBI seized a black

long-sleeve jacket with distinct white stripes and boots that are consistent with that worn by SUBJECT-1 during the kidnapping.

In comparison, Defendant Alston was located and arrested in the apartment unit for which the FBI had a residential search warrant. During the search, law enforcement recovered a handgun from the top of the kitchen cabinets. The leaseholder, an older maternal figure who was surprised about the presence of a firearm, was the only other occupant of the apartment unit. Law enforcement confirmed that Defendant Alston had been residing in that apartment unit.

### Procedural History

On July 11, 2025, an initial appearance was held before Magistrate Judge Harvey. At the hearing, the Government moved to detain Defendant Alston pursuant to 18 U.S.C. §§ 3142(d)(1)(A)(iii) and (f)(1)(E).

### <u>ARGUMENT</u>

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C. § 3142(e). In determining whether any condition or combinations of conditions will assure the safety of the community, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

As a preliminary matter, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the

government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). *See also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery. *See Smith*, 79 F.3d at 1210, and *Williams*, 798 F. Supp. at 36.

## I.    The Nature and Circumstances of this Offense Merits Detention.

The Court has repeatedly held that the mere possession—putting aside, for a moment, the use—of an illegal firearm poses a risk of danger to the community. *See, e.g.*, *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential to escalate into violence," particularly when defendant's prior convictions indicate a predilection for violence); *United States v. Riggins*, 456 F. Supp. 3d 138, 144 (D.D.C. 2020) ("[T]he possession of a firearm, especially while seemingly on a drug such as PCP, presents a serious danger to the community."); *United States v. Gassaway*, No. 21-cr-550 (RCL), 2021 U.S. Dist. LEXIS 175978 at *9-10 (D.D.C. Sept. 16, 2021) (collecting cases and holding that unlawful firearm possession is dangerous to the public); *United States v. Howard*, No. 20-mj-181 (BAH), 2020 U.S. Dist. LEXIS 172978, 2020 WL 5642288, at *3 (D.D.C. Sept. 21, 2020) ("Illegally possessing a concealed firearm in public where other people are congregated, as alleged, poses an inherent risk of danger to the community."). Moreover, this Court has warned against discounting the inherent danger associated with loaded firearms. *See, e.g.*, *United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *7–8 (D.D.C. Feb. 6, 2023) (Howell, C.J.) (explaining that the absence of

evidence of "use" "does little to detract from" the danger posed by a firearm "loaded with 19 rounds of ammunition in an extended magazine, . . . more ammunition than the gun was originally manufactured to carry, thereby increasing its potential to do greater harm" and placement "at the ready, on his person, and easily within reach"), *aff'd,* No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023); *see also United States v. Kent,* 496 F. Supp. 3d 500, 502 (D.D.C. 2020) (Faruqui, M.J.) (holding that a defendant should be detained pretrial in part because "the firearm recovered from the defendant's person had a round already chambered, making the circumstances even more troubling"), *aff'd* (D.D.C. Nov. 5, 2020).

Here, a firearm was not just possessed, but it was used against the victim so the Defendants could effectuate a carjacking and robbery of his vehicle, wallet, and cellphone.[1]  More specifically, Defendant Middleton and Defendant Alston (who are 32 and 27 years old, respectively) approached a 73-year-old man from behind; struck him with the butt of a gun; robbed him at gunpoint of his keys, cellphone, and wallet; ransacked his home; kept him tied up and held hostage while they used his vehicle to attempt withdrawals at several ATMs in Maryland; stole several thousand dollars from him; abandoned him in a parking lot with his hands zip tied behind his back and no way to call for help; and ultimately torched his vehicle such that it was utterly undriveable. As this Court explained in *United States v. Lee,* "[t]he best outcome, if everything goes as planned during an armed robbery, involves a victim's being placed at risk and feeling terrified for his safety, possibly for years to come, and if things go wrong, someone—or multiple people—could be killed or seriously injured."  195 F.Supp.3d 120, 129 (D.D.C. 2016) (finding nature and circumstances

---

[1] In Counts Two and Three of the Indictment, the Defendants have been charged with Carjacking While Armed and Possession of a Firearm During a Crim of Violence under DC law. It should be noted that, under 23 D.C. Code § 1322(c), Carjacking While Armed qualifies as a "crime of violence" that carries a rebuttable presumption that there is no condition or combination of conditions that would reasonably assure the safety of the community.

weighing heavily in favor of detention in a case where a single robbery was charged).  But the Defendants' frightening conduct extends way beyond a routine robbery.  Their participation in a coordinated carjacking, robbery, and kidnapping was so inherently dangerous that it placed not only the victim, but the whole the community, at risk.  The victim described a "mock execution" such that he thought the Defendants were going to kill him.  This behavior demonstrates a complete disregard for the safety of other members of our community and shows the lengths to which the Defendants will put their own goals above the safety of others.  "[S]uch active use of a gun in connection with or to facilitate another criminal offense . . . heighten[s] the danger to the community and other persons."  *United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *7 (D.D.C. Feb. 6, 2023) (Howell, J.).  Because their conduct shows the danger that they would pose to the community if released, the nature and circumstances of this offense weigh heavily in favor of detention.[2]

## II.    <u>The Weight of the Evidence Against the Defendant Favors Detention.</u>

The second factor to be considered, the weight of the evidence, also favors detention.  The Government's case against the Defendants is strong.  The Defendants are linked to the charged offenses by several critical pieces of evidence: the subject vehicle, which is registered to Defendant Middleton; their distinctive clothing, some of which they are wearing in iCloud photos (such as Defendant Alston's Nike DT 96 sneakers) and some of which was seized at the time of their arrests

---

[2] The Government seeks Defendant Alston's detention pursuant to, among another provision, 18 U.S.C. 3142(f)(1)(E) (Firearm/Other Dangerous Weapon).  The Indictment charges the Defendants with possessing a firearm or imitation thereof during the commission of the instant offense.  That finding of probable cause by the Grand Jury, coupled with the victim's statements to law enforcements (as described above) in which he described the Defendants using a gun, is sufficient for detention.  Indeed, the D.C. Circuit has held that other dangerous weapons—beyond a working firearm—qualify under this provision.  *See, e.g.*, *United States v. Munchel*, 991 F.3d 1273, 1281 (D.C. Cir. 2021) (taser).

(such Defendant Middleton's black long-sleeve jacket with white stripes); historical cell site location data that places both of their devices at several relevant locations, such as the locations of the kidnapping, ATM withdrawals, and the victim's vehicle burning; CashApp transactions from the victim's account to (and at their direction, pursuant to iCloud messages) traceable associates of theirs; phone calls; CCTV footage from the victim's apartment building; CCTV footage from the targeted ATMs; and the firearm recovered from Defendant Alston's residence at the time of his arrest. In all, the weight of the evidence against them is strong.

This factor should be considered equally with the other factors under § 3142. In *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 U.S. Dist. LEXIS 18988, at *29-30. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). Moreover, the Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). Indeed, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 U.S. Dist. LEXIS 18988, at *29-30. So it is in this case, the weight and strength of the evidence increases the prospect that the Defendants will present a danger to the community if released.

**III.**    **The Defendant's History and Characteristics also Favor Detention.**

The third factor, the history and characteristics of the defendant, also heavily favors detention, as Defendant Alston has a history of committing gun-related offenses and violating the terms of his supervision.

Defendant Alston has a long history of gun possession and gun violence.[3]  For example, on October 17, 2016, Defendant Alston was convicted of Aggravated Assault While Armed (Firearm or Imitation Thereof) in DC Superior Court Case No. 2015 CF3 016356.  The underlying conduct of that conviction included Defendant Alston brandishing, pistol whipping, and firing a gun at someone.  More specifically, Defendant Alston had challenged a 17 year old to a fist fight, but brandished a handgun once they had entered an alley.  Defendant Alston quickly pistol whipped the victim in the head with his gun.  As the victim turned to flee and seek refuge, Defendant Alston fired it into the victim's side at close range.  The victim underwent at least two surgeries to repair his internal organs and remove a bullet that was lodged in his side.

After Defendant Alston's 60-month term of incarceration from the shooting, he was placed on supervised release, which was set to expire in April 2023.  However, Defendant Alston's supervision was ultimately revoked because of another arrest and conviction, as explained directly below.

On January 18, 2023, Defendant was convicted of Unlawful Possession of a Firearm (Prior Conviction) in DC Superior Court Case No. 2022 CF2 004293.  More specifically, MPD had

---

[3] In addition to the instances described herein, the Court should consider the information on Pages 3–5 of the Pretrial Services Report, as well as Defendant Alston's arrest on April 7, 2021. More specifically, on that date, Defendant Alston was involved in a car accident.  When law enforcement responded to the scene, they noticed a firearm under the driver's seat of the vehicle, from which Defendant Alston was seen exiting.  Defendant Alston was arrested, but the Government did not file any charges.

responded to 812 Chesapeake Street SE (which is close to the location at which he was arrested in the instant case) for a call for service of a person with a gun. When MPD arrived at the apartment, an individual answered the door and exclaimed that Defendant Alston had a gun and that IT was afraid of IT's safety. Officers found Defendant Alston in a bedroom of that apartment concealing a handgun under a blanket on the bed. He was the only one in that bedroom at the time.

After Defendant Alston served a term of incarceration for the foregoing conviction, he was (again) placed on supervised release, which was set to expire in December 2027. He was on this supervision at the time he committed the instant kidnapping offense. And, according to the Pretrial Services Report, Defendant Alston was not even compliant with his supervision because he had failed to report to meetings and drug testing. Moreover, as explained above, law enforcement recovered a firearm from the apartment in which he was residing when he was arrested for the instant kidnapping offense. Defendant Alston has been given multiple opportunities to demonstrate that he can comply with conditions of supervision while in the community—both before and after conviction. Instead, he chose to unlawfully possess a firearm and, more concerningly, escalate to more violent conduct involving that firearm, as demonstrated by the instant kidnaping case. In all, Defendant Alston's criminal conduct while he is in the community demonstrates that detention is the only assurance the safety of the community. *See United States v. Munchel*, 991 F.3d 1273, 1281 (D.C. Cir. 2021) (concluding that courts can and should "consider whether it believes the defendant will actually abide by its conditions when making the release determination"); *see, e.g., United States v. Glasgow*, No. 1:20-cr-27-7 (KBJ), 2021 U.S. Dist. LEXIS 109972, at *37 (D.D.C. June 11, 2021) ("Because Glasgow has previously disobeyed a court-ordered condition of pre-trial supervision, the Court has little faith that he would not do so again if released pending trial."). Accordingly, the third factor weighs heavily in favor of

continued detention.

## IV.    **The Defendants Present a Danger to Our Community.**

The fourth factor—"the nature and seriousness of the danger to any person or the community that would be posed" by release—also weighs heavily in favor of detention. The charged offense involves the Defendants' use of a firearm in order to pistol whip, rob, carjack, and kidnap a 73-year-old man. The Defendants participated in an orchestrated conspiracy to point a gun and place a senior citizen at grave risk to take his money and property. Their conduct created an incredibly dangerous situation for the victim, other members of the community, and themselves. They also orchestrated and executed a plan to distance themselves and avoid detection from the instant offense by structuring the subsequent transactions from the victim's CashApp account. Indeed, they created multiple layers of financial transactions and involved other parties in order to ultimately withdraw the victim's money without using their own bank accounts. Accordingly, the facts of this kidnapping case, along with his history and characteristics, make clear that Defendant Alston is an individual who possesses guns and use them to commit violent crimes against members of the community. The fact that Defendant Alston was on supervised release when he committed his last offense, as well as when he committed the instant offense, puts the community at grave risk if he were released. For these reasons, the Government submits that the Court should order Defendant Alston's detention during the pendency of this case to protect the community.

## CONCLUSION

The Government respectfully requests that the Court issue an Order granting its motion that the Defendants be held without bond pending trial.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    <u>/s/ Mark Levy</u>
       Mark Levy
       DC Bar No. 241668

       Assistant United States Attorneys
       Federal Major Crimes Section
       United States Attorney's Office for D.C.
       601 D Street NW, Fifth Floor
       Washington, D.C. 20530